**STATE of Missouri, Respondent,**

v.

**Brooks K. SIPE, Appellant.**

**No. WD 33205.**

Missouri Court of Appeals, Western District.

Feb. 1, 1983.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied March 29, 1983.

Application to Transfer Denied April 26, 1983.

Robert G. Duncan, Gladstone, for appellant.

John Ashcroft, Atty. Gen., Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

Before SHANGLER, P.J., and PRITCHARD and DIXON, JJ.

PRITCHARD, Judge.

By the verdict of a jury appellant was convicted of the crime of kidnapping, § 565.110, RSMo 1978, and was sentenced by the trial court in accordance with the verdict to ten years imprisonment in the Division of Corrections.

A synopsis of the evidence, the sufficiency of which is not questioned, is this: On June 20, 1980, Mary Sipe, who was then the wife of appellant, arrived at her place of work in North Kansas City at 7:55 a.m. As she entered the door, appellant and two other men grabbed her and forced her, re-

sisting and struggling, into an automobile which appellant drove away. One of the men sat on the passenger side above Mary, who was on the floor and kicking at the door to try to get some type of attention. She continued fighting and appellant put his hand in her mouth and said he was going to rip it (the inside of her mouth was ripped) if she did not keep quiet. Appellant then paid his two companions $200 each, and they left the car. Appellant then drove north and parked in the middle of a rural field, the time being about 9:00 a.m. After some conversation between the two, appellant placed Mary in the trunk of the car about 1:00 or 2:00 p.m. Prior to that time appellant pulled Mary's hair, and kicked and hit her. He drove some 15 minutes to some unidentified place, then back to another rural area until about 8:30 p.m. During all of this time appellant was harassing Mary about dropping some kind of charges against him. Mary begged appellant to take her to a doctor to take care of her torn mouth, and he took her to the Smithville Hospital emergency room where he told the admittance clerk that Mary had been in an automobile accident. He went into the admittance room and Mary went into one of the emergency rooms where she called her mother who called the police who came and arrested appellant.

By his first point appellant claims error of the trial court in refusing to allow him to cross-examine Mary as to his efforts to contact her before the alleged kidnapping as to their previous separations and reconciliations. He says that the evidence was relevant to the issue of his purpose (intent). On cross-examination, Mary testified without objection that they were married on January 29, 1972, first separated from him for a few days in 1973, going back to him, then separating two more times, including the last one in February, 1980, when she came to Kansas City. Objections upon the ground of irrelevancy were sustained to these questions put to Mary: That she went back to appellant after the second separation; that they were living in a home he was buying in Houston; that she left while appellant was at work, leaving no notice or note or telling him she was going to leave; that appellant sent her flowers, cassette tapes, and his mother flew up and tried to talk to her. Again without objection, Mary testified that appellant told her on numerous occasions, before and after he beat her up, that all he wanted to do was to talk to her; to find out why she had left him; he told her that all he wanted was for her to come back to Houston and be his wife again; he told her he loved her, that he did not want to hurt her, and could not live without her; and that if she were mad at him, she could do anything she wanted to him so long as she did not put out his eyes, right there in the car, so she would get it out of her system.

Appellant testified that at the time Mary left him in Houston, they had no prior arguments or quarrels. She left no message that she was leaving except a note that he found across the street which said, "I won't be coming back". He attempted to contact her, by phone calls, at her mother's home in North Kansas City, a number of times, but did not speak to her—she refused. He sent her flowers on several occasions, candy, and a large cake with a message on it that he would love her forever. He testified that he still loved her. His mother flew up and tried to talk to Mary and get her to talk to him to work out their problems. He wanted her to come back to him. He and two other fellows put Mary in the car so he could talk to her which was the only thing he knew he could do. He did not purposely hurt her, it was a defensive move if he stuck his fingers in her mouth as she struggled in the car. He denied kicking her, striking her or pulling her hair. He did not intend to take her back home (to Houston) without her agreeing to it. It was her idea to get into the trunk so he could get her some cigarettes. He did not do all this (the acts) for the purpose of terrorizing her. He took the two men with him to Mary's place of work to make sure as a last resort and final chance to speak to her, and with them he admitted abducting her from her place of work, for the purpose of trying to talk to her.

The detail of all the testimony, above set forth, shows that appellant got everything before the jury (regardless of relevancy) upon his theory as to why his wife, Mary, was abducted by him and his two (unknown) assistants—to find out from her why she left him from Houston. Mary, herself, testified that appellant told her on numerous occasions that all he wanted to do was to talk to her to find out why she had left him; that all he wanted was for her to come back to Houston to be his wife again. He testified to the same state of mind at the time of abduction. The gist of his theory, apparently of justifiable abduction so he could talk to his wife, Mary, about the causes of the separation, were substantially presented to the jury by the testimony, including any "ill will" on Mary's part. The intent of appellant in abducting Mary, with the aid of two accomplices, could be inferred by the jury under § 565.110, which provides in part that kidnapping entails "the purpose of inflicting * * * physical injury on or terrorizing the victim of another." The jury could have chosen to believe appellant's version as presented by all the evidence, but quite apparently did not do so. The matters ruled out of evidence by the trial court (that appellant and Mary had been married and had twice separated) would be irrelevant and collateral. See *State v. Holiday,* 574 S.W.2d 429 (Mo.App. 1978); *State v. Edmonson,* 371 S.W.2d 273 (Mo.1963). Note also *State v. Watson,* 603 S.W.2d 530 (Mo. banc 1980), where it was held that it was error to exclude evidence that appellant had been tried and acquitted for shooting another, the error was harmless because that evidence was before the jury by another means—the statement of counsel in open court that appellant had been found not guilty of that offense; and *State v. Williams,* 513 S.W.2d 718 (Mo.App. 1974), where the court found no prejudicial error in excluding records of the prior convictions of a witness because those convictions were admitted by him before the jury. Point I is overruled.

Appellant's second point is that the trial court erred in permitting the prosecuting attorney to testify on rebuttal that he had never offered him a plea bargain agreement by which he would receive probation. He says the rebuttal testimony was as to a collateral matter which had first been opened up by the state over objection, and during the cross-examination of appellant and thus was improper rebuttal evidence.

In the state's case in chief, detective Wells testified: "Q. Did you have occasion later on January 26th, 1981, to have a conversation with Mr. Sipe? A. Yes, I did. Q. And where did this take place? A. Here in the prosecutor's office on the way to the jail. Q. Did you interrogate Mr. Sipe or did he approach you? A. He approached me. Q. And why did he approach you? A. He was wanting to get back some kind of agreement that was made between him and his attorney and the prosecutor. Q. You don't know what that agreement was? A. I heard what it was but, you know, to state a fact, no, I don't. Q. What was it? MR. DUNCAN: Well, your honor, I think that—I believe any plea negotiations or offers of settlement are inadmissible, your honor. I don't think they____ MR. HENSLEY: Fine, your honor, I don't intend to pursue it." Wells went on to testify that appellant asked him to talk to the prosecutor on his behalf to see if Wells could make some kind of arrangement where appellant could get probation and be sent back to Texas. Wells told appellant that the best thing for him to do was to contact his attorney and have him talk to the prosecutor. Appellant told Wells that he would be willing to give him the names of the two men who assisted him in kidnapping his wife if Wells would talk to the prosecutor for him. Appellant called Wells later that day and asked what he had found out from Mr. Brandom. Wells told him, "Just exactly what Mr. Brandom told me: That he was not making any deal." Appellant then pleaded with Wells to help him out, to work with him, and that he would come across with these two names.

Then, on cross-examination, appellant testified that detective Wells had pressed him time and time again as to who his two accomplices were, and again on January 26,

1981: "A. Yeah, he asked me that day also. Let me make it clear. He asked me earlier that morning several times who the fellows were and later on that afternoon____ Q. You approached him; isn't that true? A. You know, I asked him about it but I didn't tell him, you know. Like I said____ Q. You told Mr. Wells you wanted to talk to him? A. Right. And I asked him, you know____ Q. And you wanted to talk to him about turning these guys over to the prosecutor's office in exchange for some type of deal; isn't that correct? A. Only after the other policeman—Randy or whatever his last name was—he kept urging on saying, *'Brooks, this is your only chance to get back the probation deal that the prosecutor had offered you originally.' They were going to give me probation on this.*" [Italics added.]

■ As noted in the resumé, supra, of detective Wells' testimony, there was no reference to the prosecutor having offered appellant probation as part of a deal in plea bargaining. That matter was first injected into the case by appellant's *voluntary* statement, as to this collateral matter, and thus the state is not bound by appellant's answer under *State v. King,* 342 Mo. 975, 119 S.W.2d 277 (Mo.1938). In *State v. Cheesebrew,* 575 S.W.2d 218, 223[12, 13] (Mo.App. 1978), it was said, "When a collateral issue is first tendered by the defense in direct examination or is volunteered on cross-examination it becomes a proper subject for rebuttal. (Citing cases.)" Although appellant objected (after the answer was given) to the prosecutor's rebuttal testimony that he had not offered him probation as a part of a plea bargain, there was no motion to strike it so as properly to preserve it for review. Nonetheless, the matter is here considered. The evidence of appellant's offer to detective Wells to reveal the names of the two accomplices is an admission against his interest relating to his guilt of the alleged kidnapping. Because they were police officers, this evidence does not fall within the proscription of evidence of plea bargaining between the prosecutor and defendant's attorney or defendant himself if acting pro se under Rule 24.02. Compare

*United States v. Grant,* 622 F.2d 308 (8th Cir.1980), so construing the similar Fed.R. Crim.P. § 11(e)(6). The matter goes to appellant's credibility in asserting, voluntarily, that he had been offered probation by the prosecutor, and his rebuttal testimony as to that assertion was properly received. Point II is overruled.

■ By Point III, appellant asserts error by reason of the failure of the trial court to instruct on a claimed lesser included offense of felonious restraint. In his motion for new trial, appellant did not set forth the facts in evidence which would warrant the giving of an instruction on the lesser included offense, and the contention is therefore not properly preserved for review. Nonetheless, the crime of felonious restraint under § 565.120.1 is not a lesser included offense of kidnapping under § 565.110.1 because it requires proof of an element, exposure to a substantial risk of harm, which is not included in the kidnapping statute which does not denominate felonious restraint as being a lesser degree of kidnapping under § 556.046. See *State v. Amsden,* 299 S.W.2d 498 (Mo.1957); and note *State v. Harris,* 620 S.W.2d 349, 354–355 (Mo. banc 1981); and *State v. Seddens,* 624 S.W.2d 470, 473[9] (Mo.App.1981), specifically holding that felonious restraint is not a lesser included offense of kidnapping because the necessary identity of elements is lacking. Point III is overruled.

■ Instruction No. 6 on the subject of false imprisonment included this paragraph: "If you find the defendant guilty of false imprisonment, you will assess and declare the punishment at imprisonment for a term *of years* fixed by you, but not to exceed one year." In Point IV, appellant claims that the deviation from MAI–CR 2d 19.24 in including the italicized words constitutes reversible error. It is argued that the deviation deleted an alternative punishment possibility from the jury and suggested that the offense was more serious than the legislature intended. Obviously, the inclusion of the words "of years" was a typographical error, but the instruction went on to limit

the punishment to one year if the jury found appellant guilty of false imprisonment, which it did not do. Appellant was found guilty of the greater offense of kidnapping, and the technical error of the submission was harmless. Compare *State v. Morse,* 514 S.W.2d 375, 377[4] (Mo.App. 1974); and *State v. Pitchford,* 556 S.W.2d 57, 59[1] (Mo.App.1977), where in both cases, the trial court did not instruct on the range of punishment for included offenses, and it held that there was no reversible error and that the error was harmless. Such is the situation here, and Point IV is overruled.

The judgment is affirmed.

All concur.